Receipt number AUSFCC-6140818

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **PETER C. FAERBER**, Lieutenant Colonel, U.S. Marine Corps Reserve, <br><br>*Plaintiff*, <br><br>v. <br><br>**UNITED STATES OF AMERICA** <br><br>*Defendant*. | **COMPLAINT** <br><br>**20-509C** |

### I.   INTRODUCTION

1.   This action concerns the Department of the Navy's improper separation of Lieutenant Colonel ("LtCol") Peter C. Faerber from active duty in the U.S. Marine Corps ("USMC") on March 21, 2017, while he was on valid medical hold pending the results of a Physical Evaluation Board for injuries he sustained in the line of duty.  LtCol Faerber was unlawfully separated after he served 17 years and 361 days of cumulative service – just four days short of entering a status called "Sanctuary."  Entry into Sanctuary is achieved upon the completion of 18 years of cumulative active duty service, and upon entry into sanctuary a Reservist cannot normally be separated prior to reaching his eligibility for regular retirement at 20 years of service.  Had this wrongful termination of medical hold not occurred, LtCol Faerber would have entered Sanctuary, been able to remain on active duty in the USMC, and ultimately been eligible to retire from active military service on April 1, 2019.

### II.   JURISDICTION

2.   The United States Court of Federal Claims has jurisdiction over this suit under the Tucker Act, 28 U.S.C. § 1491.  LtCol Faerber raises claims arising under federal statutes and

military regulations. The money-mandating statute is the 37 U.S.C. § 204 (Military Pay Act). *See also Pearl v. United States*, 111 Fed. Cl. 301, 308 (2013).

3. If successful in this action, LtCol Faerber will be entitled to back pay, entitlements, and allowances in excess of $10,000.

4. The Plaintiff, LtCol Faerber, was commissioned in the U.S. Marine Corps Reserve ("USMCR") on December 20, 1992. Prior to being commissioned, he attended USMC Platoon Leaders' Course (Juniors) in the summer of 1991 and Platoon Leaders' Course (Seniors) in the summer of 1992. He served his initial commitment on active duty in the USMC from October 17, 1993, until December 30, 2002. LtCol Faerber has maintained continuous service in the USMCR since completing his initial service commitment, and continues to serve to this day.

5. The Defendant is the United States of America.

### III.   STATUTE OF LIMITATIONS

6. 28 U.S.C. § 2501 requires the filing of a claim in this Court within six years after the first claim accrues. LtCol Faerber's claim first accrued on March 21, 2017, when the USMC improperly released LtCol Faerber from active duty service despite his medical hold status. Accordingly, LtCol Faerber's claims are timely before this Court.

### IV.   STATEMENT OF FACTS

#### Lieutenant Colonel Faerber's Background and
#### Initial Period of Active Duty

7. Peter C. Faerber is a lieutenant colonel in the USMCR.

8. LtCol Faerber was commissioned a second lieutenant in the USMCR on December 20, 1992.

9. LtCol Faerber's initial Military Occupational Specialty ("MOS") was a pilot flying the AH-1W Super Cobra attack helicopter (MOS 7565).

10. During his initial service obligation, LtCol Faerber served continuously on active duty from October 17, 1993, until December 30, 2002.

11. During his initial period of active duty, LtCol Faerber served as a Cobra pilot with multiple USMC aviation units, including HMLA-367, HMM-268(+), and HMLA-267. He also served with the infantry in 1st Battalion, 1st Marine Regiment ("1/1"), as both the Headquarters & Service Company Commander and the Battalion Air Officer. He deployed to the Persian Gulf with the 11th Marine Expeditionary Unit ("MEU") while assigned to HMM-268(+) in 1998. He deployed again with the 11th MEU to the Persian Gulf in his capacities with 1/1 in 1999. While deployed with the 11th MEU, he participated in OPERATION SOUTHERN WATCH, OPERATION DESERT THUNDER, OPERATION SAFE DEPARTURE, and OPERATION STABILIZE.

12. During his initial period of active duty, LtCol Faerber was stationed at Marine Corps Base Quantico, Virginia; Naval Air Station Pensacola, Florida; Marine Corps Base Camp Pendleton, California; Naval Post-graduate School, Monterey, California; and Naval Safety Center, Norfolk, Virginia.

13. During his initial period of active duty, LtCol Faerber was promoted to the rank of Major on October 1, 2002.

14. After completing his initial commitment on active duty, LtCol Faerber attended law school at his own expense at the Ohio State University's Moritz College of Law, graduating on June 11, 2006, and passing the Ohio bar examination in 2006. While attending law school, LtCol Faerber remained in the USMCR.

15. After law school, LtCol Faerber volunteered to serve full-time in an unpaid civilian capacity as the Legal Assistance Officer at the Marine Corps Legal Services Support Section in Okinawa, Japan.

16. In 2007, while LtCol Faerber was in Okinawa, the USMC placed him on active duty and sent him to Naval Justice School in Newport, Rhode Island. Upon graduation from Naval Justice School in 2007, the USMC changed LtCol Faerber's primary MOS from attack helicopter pilot to military attorney (MOS 4402), also referred to as Judge Advocate.

17. From the time of his law school graduation in 2006 until he started attending Naval Justice School in 2007, LtCol Faerber remained in the USMCR, but did not serve on active duty.

18. After graduating from Naval Justice School, LtCol Faerber completed a combination of consecutive active duty drill periods through December 2007.

**Lieutenant Colonel Faerber's Active Duty Mobilizations**

19. Starting in January 2008, the Marine Corps issued a series of mobilization orders to LtCol Faerber. Mobilization orders are short- to long-term contracts in which a member of the reserve component (a "Reservist") serves a specified length of time on active duty.

20. While on these various mobilization orders from 2008 through 2014, LtCol Faerber performed duties at locations in the U.S., at sea, and throughout the world, including California, Colorado, Hawaii, North Carolina, Afghanistan, Australia, France, Germany, Japan, New Zealand, Thailand, and aboard the USS BELLEAU WOOD (LHA-3). During this time he also participated in various operations and exercises, including OPERATION CARING RESPONSE in Thailand (Myanmar typhoon relief), Exercise Talisman Saber in Australia, and Exercise Cobra Gold in Thailand.

21. In mid-2015, a representative of the Marine Corps contacted LtCol Faerber concerning an opportunity to mobilize again.

22. During early August 2015, LtCol Faerber discussed the proposed mobilization with the Headquarters, U.S. Marine Corps ("HQMC") representative, Captain ("Capt") Karen A. Tampanello, USMC.[1]

23. During their conversations, LtCol Faerber asked Capt Tampanello and other HQMC representatives whether any waivers were required from LtCol Faerber before he could accept the mobilization orders. Specifically, he and Capt Tampanello discussed waivers of (1) the 1095 Rule, (2) High Active Duty Time ("HADT"), and (3) Sanctuary. After extensive research and developing supporting documentation, Capt Tampanello, serving as the USMC's official agent, determined that no waivers were necessary for the 1095 Rule, HADT, or Sanctuary. **Exhibit 1**, Faerber email exchange dated Aug. 6, 2015; **Exhibit 2**, Tampanello email exchange dated Aug. 5, 2015.

24. The "1095 Rule" limits Reservists to serving a maximum of 1,095 days (three years) on active duty within any four year period. The Services monitor this time because Reservists who exceed the 1,095 day threshold count against the statutory end-strength authorized for active duty forces. Each Service is allocated a limited number of waivers to the 1095 Rule for each fiscal year.

25. HADT Reservists are those who have completed 16.5 years of total active duty time. After 16.5 years of active duty service, the military considers such service members so close to achieving Sanctuary that they warrant special monitoring.

---

[1] Captain Tampanello was subsequently promoted and married; she is the same person as Major ("Maj") Karen A. Perry, USMC, whose name may appear later in this case.

26. "Sanctuary" is a protection established in 10 U.S.C. § 12686 that grants Reservists who complete 18 years of active duty service permission to serve through completion of their 20th year of active duty.

27. The applicable USMC regulation, Marine Corps Order ("MCO") 1800.11, addresses the issue of Sanctuary waivers in Chapter 1, paragraph 12a, as follows: "Orders requiring waiver of sanctuary protection must be for 179 days or less and pursuant to authority of 10 U.S.C. 12301." **Exhibit 3**, MCO 1800.11.

28. In addition to Capt Tampanello, several other members of HQMC and USMC leadership were on notice of the discussions related to LtCol Faerber's potential need for waivers related to the 1095 Rule, HADT, and Sanctuary. These senior HQMC personnel included Ms. Mary Hostetter, the Head of Legal Assistance and the Disability Evaluation System for the USMC; Mr. Brad Swearingen, the Operational Sponsor of Community Development, Strategy and Plans for the USMC's Judge Advocate Division at that time; and Colonel David J. Bligh, the then-Deputy Staff Judge Advocate to the Commandant of the Marine Corps (the second most senior attorney for the Marine Corps). None requested any changes to the proposed orders nor a waiver of the 1095 Rule, HADT, or Sanctuary.

29. HQMC issued the mobilization orders to LtCol Faerber in late September 2015 with an effective date of the October 1, 2015.

30. LtCol Faerber was ordered to active duty in support of OPERATION FREEDOM SENTINEL and pursuant to 10 U.S.C. § 12301(d). **Exhibit 4**, Faerber Orders dated Sept. 23, 2015.

31. The orders placed LtCol Faerber on active duty for 183 days from October 1, 2015 until March 31, 2016.

32.     The orders directed LtCol Faerber to report to Camp Pendleton, California, for duty as a Disability Evaluation System ("DES") Attorney.  The mobilization orders were Permanent Change of Station ("PCS") orders requiring LtCol Faerber to move to a new duty station located in a different geographic location.  The orders granted him the funding and time (seven days) to move himself, his wife, their two young daughters (ages 8 months and 2.5 years), and all of their household goods from Ohio to Camp Pendleton, California.

33.     The orders included no waivers for the 1095 Rule, HADT, or Sanctuary.

34.     Not only did the orders contain no Sanctuary waiver, the USMC actually required LtCol Faerber the certify his understanding that as a result of accepting the orders he "may become eligible for sanctuary zone protection under Title 10, United States Code, Section 12686(a)."

35.     LtCol Faerber executed the orders and commenced active duty on October 1, 2015.

36.     LtCol Faerber reported for duty at Wounded Warrior Battalion-West for service as a DES attorney.

### Lieutenant Colonel Faerber's Injury

37.     While on active duty pursuant to the mobilization orders, LtCol Faerber injured his lower back in December 2015 while preparing for the USMC Combat Fitness Test ("CFT").  The CFT is one of two mandatory annual fitness tests required of all Marines (the other is the Physical Fitness Test ("PFT")).

38.     LtCol Faerber suffered a bulged disc in his lower spine causing sudden shooting, swarming pain in his lower back that radiated to his right hip.  In addition, his knees began to fail, and he experienced dull, focalized pain and pain on motion in his upper back.

39.     LtCol Faerber was 46 years old at the time of his injury.  Notwithstanding his injury, LtCol Faerber planned to participate in the CFT.  However, due to his age, prior to taking the CFT,

LtCol Faerber was required to complete a mandatory pre-testing waiver for all Marines age 46 and over. When LtCol Faerber completed the waiver, he disclosed his recent back injury.

40. Upon review of the waiver, medical personnel from LtCol Faerber's command informed him that the severity of his injury precluded him from participating in the CFT. Medical representatives subsequently scheduled LtCol Faerber for medical examination and imagery. LtCol Faerber was also placed on "light duty" status during December 2015.

41. "Light duty" is temporary, medically restricted duty that relieves the service member from performing certain regular work duties in order to evaluate the effect that an illness, injury, or disease process has on a service member's ability to return to a medically unrestricted or full duty status.

42. LtCol Faerber was referred to his treating physician, Captain ("CAPT") C. J. Westropp, U.S. Navy, in January 2016. Upon evaluation, CAPT Westropp diagnosed LtCol Faerber with Lumbar Degenerative Disc Disease. Dr. Westropp prescribed physical therapy and chiropractic care as the appropriate course of treatment and placed LtCol Faerber on limited duty ("LIMDU") for an initial term of six months commencing on March 21, 2016.

43. LIMDU restricts the military duties of a service member as a result of illness, injury or disease process, but allows a service member to work in a limited capacity based upon the type of illness, injury, or disease process and the recommendation of their medical provider. Assignment to a period of LIMDU is predicated on a reasonable assumption that a service member will return to full and unrestricted duty upon completion of LIMDU.

44. Upon assignment to LIMDU, LtCol Faerber started his assigned treatment immediately, attending scheduled and walk-in appointments several times a week and aggressively pursuing self-help stretching and core strengthening.

**Lieutenant Colonel Faerber's Medical Hold and Medical Rehabilitation**

45. By virtue of his assignment to LIMDU and his proximity to the end of his active duty orders which ended on March 31, 2016, the USMC was required to place LtCol Faerber on "Medical Hold" to facilitate his on-going medical treatment and evaluation and permit his eventual return to full duty.

46. The USMC placed LtCol Faerber on Medical Hold on March 21, 2016.

47. Medical Hold is a status assigned to service members who are not medically cleared for release from active duty until their medical condition is resolved. In other words, LtCol Faerber was held on active duty pending resolution of his medical condition.

48. The Department of the Navy regulation applicable at the time of LtCol Faerber's assignment to Medical Hold, Secretary of the Navy Instruction ("SECNAVINST") 1770.3D (Mar. 17, 2006), describes Medical Hold as follows:

> Medical Hold (MedHold). Retention of Reservists on active duty to receive medical treatment for service-connected injuries, illnesses and/or diseases until determined Fit for Duty by the [Benefits Issuing Authority ("BIA")] Senior Medical Officer (SMO) and/or Medical Status Review Officer (MSRO), or until final disposition is determined by the [Physical Evaluation Board ("PEB")]. Members will be placed in a duty status commensurate with their physical abilities.

**Exhibit 5**, SECNAVINST 1770.3D.

49. Paragraph 6.b of SECNAVIST 1770.3D defines the "Benefits Issuing Authority" as "[d]elegated authority from Secretary of the Navy (SECNAV) to Chief of Naval Operations (CNO) and Commandant of the Marine Corps (CMC) to administer Medical Hold (MedHold) and Line of Duty (LOD) Determination programs."

50. Paragraph 6.e of SECNAVIST 1770.3D defines "Fit for Duty" as:

> A pronouncement by a Military physician or by a Medical Evaluation Board that a service member previously on light or limited duty has healed from the injury,

9

illness, or disease that necessitated the member's serving in a medically restricted duty status.

51. Paragraph 6.f of SECNAVIST 1770.3D defines "Fit for Continued Naval Service" as:

> A finding made exclusively by the Department of the Navy's PEB indicating that the service member is reasonably able to perform the duties of his or her office, grade, rank or rating. The finding of fit to continue naval service does not preclude subsequent temporary determinations of unsuitability for deployment, Physical Fitness Assessment participation, and disqualification from special duties or administrative actions resulting from such determinations.

52. The applicable Department of Defense regulation, Department of Defense Instruction ("DODI") 1241.2 dated May 30, 2001, required the USMC to retain LtCol Faerber on active duty until his fitness for duty was determined. **Exhibit 6**, DODI 1241.2. Paragraph 6.6.3.2 of the DODI 1241.2 states:

> A Reserve component member on active duty under a call or order to active duty specifying a period of 31 days or more, who incurs or aggravates an injury, illness, or disease in the line of duty shall, with the member's consent, be continued on active duty upon the expiration of call or order to active duty until the member is determined fit for duty or the member is separated or retired as a result of a Disability Evaluation System determination.

53. DODI 1241.2 was subsequently superseded by the regulation currently in effect, DODI 1241.01 dated April 19, 2016. DODI 1241.01 incorporated and restated the DOD's original policy regarding the mandatory retention of injured service members on active duty pending an evaluation of their fitness for duty. Specifically, paragraph 3.a.(2) of DODI 1241.01 states:

> 3. POLICY. It is DoD policy that:
>
>     a. An RC Service member is entitled to medical and dental treatment for an injury, illness, or disease that was incurred or aggravated while in a qualified duty status and that is not the result of gross negligence or misconduct (referred to in this instruction as a "covered condition"). A determination that establishes a covered condition will be referred to in this instruction as an "in-LOD determination."
>     …

>     (2) When an RC Service member is on active duty (AD) or full-time National Guard duty (FTNGD) for a period of more than 30 days and, at the scheduled end of that period, has an unresolved in-LOD condition that may render the member unfit for duty under the Disability Evaluation System (DES), but this has not yet been determined by the DES, the member:
>
>     (a) Will, with his or her consent, be retained on AD or FTNGD until:
>
>     1. Outstanding in-LOD conditions are resolved; or
>
>     2. He or she is either found fit for duty, separated, or retired as a result of a DES finding.

54. As a result of LtCol Faerber's placement on Medical Hold, the USMC modified his original mobilization orders to extend his time on active duty to resolve his medical condition.

55. The USMC issued a modification to LtCol Faerber's original mobilization orders on April 18, 2016. This modification extended his original order's end date from March 31, 2016, to September 1, 2016. This modification explicitly states that "[a]ll other provisions of the original orders remain the same." **Exhibit 7**, Faerber Orders dated Apr. 18, 2016.

56. The USMC issued a second modification to LtCol Faerber's original mobilization orders on August 23, 2016. This modification extended his original order's end date to September 21, 2016, to comport with the Medical Hold Extension Authorization. The modification explicitly states that "[a]ll other provisions of the original orders remain the same." **Exhibit 8**, Faerber Orders dated Aug. 23, 2016.

57. In September 2016, Dr. Westropp placed LtCol Faerber on a second term of LIMDU for an additional six months.

58. The USMC issued a third modification to LtCol Faerber's original mobilization orders on September 20, 2016. This modification extended his original order's end date to

February 1, 2017. This modification explicitly states that "[a]ll other provisions of the original orders remain the same." **Exhibit 9**, Faerber Orders dated Sep. 20, 2016.

59. On September 20, 2016, LtCol Sanderson Styles from HQMC Manpower Integration Branch ("MMIB") contacted LtCol Faerber via email and informed LtCol Faerber that HQMC would not extend his orders past February 1, 2017, without a signed Statement of Understanding ("SOU") waiving his right to Sanctuary. **Exhibit 10**, Styles email dated Sep. 20, 2016.

60. LtCol Styles provided no legal authority for his statement that HQMC would not extend his orders past February 1, 2017, without a signed SOU from LtCol Faerber waiving his right to Sanctuary.

61. LtCol Faerber did not sign any SOU.

62. Despite the previous communication that without a signed SOU HQMC would issue no extension to LtCol Faerber's orders beyond February 1, 2017, the USMC issued a fourth modification to LtCol Faerber's original mobilization orders on January 30, 2017. This modification extended his original order's end date to February 28, 2017. This modification explicitly states that "[a]ll other provisions of the original orders remain the same." **Exhibit 11**, Faerber Orders dated Jan. 30, 2017.

63. Although still without a signed SOU from LtCol Faerber, the USMC issued a fifth modification to LtCol Faerber's original mobilization orders on February 27, 2017. This modification extended his original order's end date to March 21, 2017. This modification explicitly states that "[a]ll other provisions of the original orders remain the same." **Exhibit 12**, Faerber Orders dated Feb. 27, 2017.

### Medical Evaluation Board and Physical Evaluation Board Processes

64. While on Medical Hold, LtCol Faerber complied with all applicable regulations, received appropriate medical treatment, and actively engaged in rehabilitation. Despite LtCol Faerber's active treatment and rehabilitation, his case required further medical evaluation because his medical condition did not ultimately improve quickly enough to meet the mandatory physical condition requirements of the USMC.

65. Accordingly, at the end of his second six-month term of LIMDU, LtCol Faerber's command referred his case to a Medical Evaluation Board ("MEB") at the Naval Hospital, Camp Pendleton, because LtCol Faerber's physician determined that even with further treatment, he would be unable to return to full duty.

66. The MEB is an initial, local review conducted by a board comprised of at least three physicians who compile, assess, and evaluate a service member's medical history and current condition. The MEB determines which cases merit referral to a PEB for a decision on whether the service member is Fit for Continued Naval Service.

67. On March 7, 2017, the MEB referred LtCol Faerber's case to a PEB at the Naval Council of Personnel Boards in Washington, D.C.

68. The PEB is a fact-finding board that evaluates all cases of physical disability on behalf of the Marine or Sailor and the Service in accordance with the Department of the Navy Disability Evaluation Manual. The PEB investigates the nature, cause, degree of severity, and probable permanency of the disability concerning the service member referred to the Board. The Board evaluates the physical condition of the service member against the physical and mental requirements of his/her particular office, grade, rank or rating. The PEB is required to provide a full and fair hearing as required by 10 U.S.C § 1214 and to make findings and recommendations

to establish the eligibility of a service member to be retained on active duty due to fitness, or separated or retired from the service because of a physical or mental disability. The PEB is comprised of two levels: the informal PEB and formal PEB.

69. On March 9, 2017, an informal PEB was convened to determine LtCol Faerber's fitness to remain in the USMC.

70. LtCol Faerber consented to remaining on active duty in a Medical Hold status pending the PEB's determination of his fitness. While on Medical Hold, LtCol Faerber continued to perform his regular military duties, consistent with his medical condition, while awaiting the PEB's determination.

71. During the time that LtCol Faerber's PEB was pending, Mr. Mark T. Brokaw was the supervisor of Reserve Medical Entitlements Determinations and the BIA representative for the USMC.

72. In an email to representatives of Wounded Warrior Regiment and HQMC dated March 17, 2017, Mr. Brokaw determined that under the applicable law, LtCol Faerber's case "meets the criteria for continuation in a medical hold status." **Exhibit 13**, Brokaw email dated Mar. 17, 2017.

73. On March 21, 2017, LtCol Faerber's Medical Hold extension pending the PEB process was approved. **Exhibit 14**, MEDHOLD approval email dated Mar. 21, 2017.

74. As of March 21, 2017, LtCol Faerber remained in a valid Medical Hold status pending the results of his PEB.

**The U.S. Marine Corps' Wrongful Termination of Lieutenant Colonel Faerber's Orders**

75. Despite the pending PEB process, the determination of the BIA that LtCol Faerber met the criteria for continuation on Medical Hold, and the approval of LtCol Faerber's Medical

Hold extension pending his PEB, the USMC wrongfully failed to extend LtCol Faerber's orders to match his approved extended Medical Hold as required by law.

76.     As of March 21, 2017, none of the required legal conditions for LtCol Faerber's departure from active duty had been met: he had not yet received a determination of Fitness for Continued Naval Service from the PEB; he had not been found Fit for Duty by his doctors; and he never signed, nor was he asked to sign, a "Release from Active Duty Against Medical Advice" form as required by SECNAVINST 1770.3D.

77.     LtCol Faerber desired to remain on active duty until his PEB proceedings were resolved. Nonetheless, the USMC unlawfully terminated LtCol Faerber's active duty status effective March 21, 2017.

78.     LtCol Faerber was notified of the USMC's decision on March 17, 2017. LtCol Faerber was surprised by the notification, which he received on a Friday and merely four days before the termination of his active duty orders. The Marine Corps gave LtCol Faerber only two full business days to complete all of his pending work, check out of his command, make arrangements to move, and transport his household goods and entire family—his wife, 3 year-old daughter, 1½ year-old daughter, and eight-week-old twins—back to Ohio. Unlike his PCS to California, LtCol Faerber did not receive appropriate time (seven days) to move himself, his family, and his household goods as he was entitled in the normal course of demobilizing and terminating orders.

79.     Just two days after LtCol Faerber's involuntary release from active duty, the PEB rendered a determination in LtCol Faerber's case on March 23, 2017. The PEB found him Fit for Continued Naval Service.

80. At this point, LtCol Faerber should have remained on active duty because after the PEB issued its findings, the Department of the Navy was required to formally serve the PEB's findings on LtCol Faerber and provide LtCol Faerber with 10 calendar days to decide whether he would appeal or accept the findings.

81. The PEB's findings were formally served on LtCol Faerber on March 30, 2017—over a week after his involuntary release from active duty.

82. On April 3, 2017, LtCol Faerber's Medical Hold extension pending the completion of the PEB process was approved. **Exhibit 15**, MEDHOLD approval email dated Apr. 3, 2017.

83. On April 10, 2017, LtCol Faerber accepted the PEB's finding of Fit for Continued Naval Service.

84. Ordinarily, a finding of Fit for Continued Naval Service would mean that, as a Reservist, LtCol Faerber was cleared to end his mobilization and his orders would terminate. It would also mean that he and his family would be provided with the time and resources required to transition from active duty. Notwithstanding any Sanctuary matters, LtCol Faerber should have remained on active duty during this transition timeframe.

85. For unknown reasons the PEB did not finalize LtCol Faerber's case (called "indexing") until June 16, 2017. Again, notwithstanding any Sanctuary matters, LtCol Faerber should not have been released from active duty until June 16, 2017, because, under normal circumstances, a service member does not begin demobilization or release from active duty status until after their case is indexed by the PEB.

86. On June 5, 2017—in a letter back-dated to April 3, 2017—LtCol Faerber was notified by the BIA that his Medical Hold was retroactively terminated with an effective termination date of March 21, 2017. **Exhibit 16**, BIA letter backdated Apr. 3, 2017.

87. The BIA provided no explanation for the termination of LtCol Faerber's Medical Hold other than "the Commandant of the Marine Corps has directed deactivation of your medical hold effective 21 Mar 2017, for an injury incurred during active duty."

88. The BIA gave no explanation for the delay in notifying LtCol Faerber of the Medical Hold termination decision.

89. The BIA's delay in notifying LtCol Faerber of the decision also delayed any appeal of the decision that LtCol Faerber had a right to submit.

90. LtCol Faerber subsequently appealed the termination of his Medical Hold orders on June 30, 2017, within the prescribed 60-day window for appeals under SECNAVINST 1770.3D.

91. Despite Mr. Brokaw's prior written statement that LtCol Faerber met the prerequisites for Medical Hold, Mr. Brokaw (the same BIA) denied his appeal over three months later on October 6, 2017.

92. On the same day, October 6, 2017, LtCol Faerber appealed the BIA's denial to the Department of the Navy's Office of the Judge Advocate General ("OJAG").

93. Per the governing rules, the OJAG had 30 days to respond to his appeal. With no explanation for the grossly inordinate delay, the OJAG answered his appeal 240 days later and confirmed the BIA's termination of LtCol Faerber's Medical Hold.

94. Had the USMC not wrongfully failed to extend LtCol Faerber's orders, he would have appropriately remained on active duty while awaiting conclusion of his PEB process and throughout his Medical Hold termination appeal process.

95. Under any circumstance, regardless of any delays, LtCol Faerber should rightfully have remained on active duty until after entering the statutory Sanctuary zone on March 25, 2017.

**Financial Damage to LtCol Faerber**

96. LtCol Faerber would have reached Sanctuary as of March 25, 2017.

97. LtCol Faerber was involuntarily terminated from active duty four days short of reaching Sanctuary. But for his unlawful involuntary removal from Medical Hold, LtCol Faerber would have entered Sanctuary.

98. Reaching Sanctuary, coupled with the finding of Fit for Continued Naval Service, would have allowed LtCol Faerber to remain on active duty.

99. Had LtCol Faerber remained on active duty, he would have continued his regular service with all attendant pay and benefits, including, *inter alia*, active duty pay, medical care, considerations for promotions, and eligibility to retire with a regular active duty retirement.

100. The USMC's improper conduct also resulted in lost regular retirement payments to LtCol Faerber.

**REQUEST FOR RELIEF**

101. WHEREFORE, LtCol Faerber respectfully requests that this Court enter judgment against the Defendant and grant the following relief:

   a. Declare that the termination of LtCol Faerber's Medical Hold on March 21, 2017, was improper and reverse LtCol Faerber's Medical Hold termination;

   b. Restore LtCol Faerber to active duty in the U.S. Marine Corps;

   c. Order the United States to pay LtCol Faerber all retroactive pay and allowances to which LtCol Faerber is entitled had his Medical Hold not been wrongfully terminated;

    d.       Declare that had his Medical Hold not been wrongfully terminated, LtCol Faerber would have entered the statutory Sanctuary zone;

    e.       Order the United States to pay all reasonable attorneys' fees and costs for bringing this action; and,

    f.       Order other and further relief as the Court deems just and proper under the circumstances of this case.

Date: April 27, 2020                        Respectfully submitted,

                                                */s/ Devin A. Winklosky*
                                                Devin A. Winklosky, Esq.
                                                Porter Wright Morris & Arthur LLP
                                                6 PPG Place, Third Floor
                                                Pittsburgh, PA 15222
                                                Tel: (412) 235-4500
                                                Email: dwinklosky@porterwright.com